**No. 26-10290**

# In the United States Court of Appeals for the Fifth Circuit

VICTOR MANUEL RAMIREZ NAJERA,
*Plaintiff-Appellant*,

*v.*

EXPERIAN INFORMATION SOLUTIONS, INC.,
*Defendant-Appellee*.

On Appeal from the United States District Court for the Northern District of Texas, Fort Worth Division, No. 4:25-cv-00443-P (Hon. Mark T. Pittman)

## BRIEF OF DEFENDANT-APPELLEE EXPERIAN INFORMATION SOLUTIONS, INC.


Allison B. Allman
**JACKSON WALKER, L.L.P.**
777 Main Street, Suite 2100
Fort Worth, TX 76102
(817) 334-7206
aallman@jw.com

Kevin P. Martin
Christopher J. C. Herbert
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
kmartin@goodwinlaw.com
cherbert@goodwinlaw.com

*Counsel for Defendant-Appellee Experian Information Solutions, Inc.*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualifications or recusal.

1. Plaintiff-Appellant: Victor Manuel Ramirez Najera.
2. Defendant-Appellee: Experian Information Solutions, Inc. The ultimate parent company of Experian Information Solutions, Inc. is Experian plc. The following companies are the US-based subsidiaries of Experian plc that are not wholly owned and are not publicly traded: (a) Central Source LLC; (b) Online Data Exchange LLC; (c) New Management Services LLC; (d) VantageScore Solutions LLC; (e) Opt-Out Services LLC. Experian plc indirectly owns 100 percent of Experian Information Solutions, Inc. Experian plc is registered as a public company in Jersey, Channel Islands, and is publicly traded on the London Stock Exchange.
3. Counsel for Plaintiff-Appellant: James Ristvedt, Consumer Justice Law Firm PLC; David Chami, Consumer Justice Law Firm PLC; Youssef Hammoud, The Credit Attorney, Inc.; Daniel Ciment, Ciment Law Firm, PLLC.

4. Counsel for Defendant-Appellee: Kevin P. Martin, Goodwin Procter LLP; Christopher J.C. Herbert, Goodwin Procter LLP; Allison B. Allman, Jackson Walker LLP.

*/s/ Kevin P. Martin*
Kevin P. Martin

***Counsel of Record for Defendant-Appellee Experian Information Solutions, Inc.***

## STATEMENT REGARDING ORAL ARGUMENT

This case involves straightforward applications of settled Fair Credit Reporting Act principles to an undisputed factual record. The district court's decision granting defendant Experian Information Solutions, Inc.'s motion for summary judgment and denying Victor Manuel Ramirez Najera's partial cross motion for summary judgment is thorough, correct, and consistent with this Court's precedents. Oral argument is not necessary, but Experian does not oppose argument if the Court believes it would be of assistance.

## TABLE OF CONTENTS

STATEMENT REGARDING JURISDICTION .....................................................1
STATEMENT OF THE ISSUES.........................................................................1
INTRODUCTION ..........................................................................................2
STATEMENT OF THE CASE.........................................................................4
I. STATUTORY AND REGULATORY BACKGROUND. ................................ 4
II. FACTUAL BACKGROUND.......................................................................... 6
A. Experian and its FCRA procedures. ......................................................6
B. Ramirez Najera's FCRA disputes.........................................................10
III. PROCEDURAL HISTORY.......................................................................... 13
A. Ramirez Najera sues Experian and the parties move for summary judgment. ...........................................................................................13
B. The district court grants summary judgment to Experian. ....................15
SUMMARY OF ARGUMENT .......................................................................18
STANDARD OF REVIEW ............................................................................20
ARGUMENT ...............................................................................................21
I. RAMIREZ NAJERA'S DAMAGES ARGUMENTS ARE NO BASIS TO OVERTURN THE DECISION BELOW. ....................................... 21
A. By leading with his damages arguments and ignoring the relative timing of events, Ramirez Najera confuses the issues on appeal. .........21
B. Summary judgment to Experian on Ramirez Najera's claims of emotional-distress damages was proper. ..............................................24
C. The district court properly ruled that Ramirez Najera could not show other forms of actual damages. ..................................................30
II. THE DISTRICT COURT CORRECTLY HELD THAT RAMIREZ NAJERA'S CHALLENGE TO EXPERIAN'S MATCHING PROCEDURES UNDER § 1681E(B) FAILS AS A MATTER OF LAW.......................................................................................... 33
A. Experian's reporting procedures are reasonable as a matter of law. .....33
B. Ramirez Najera's arguments lack merit. ..............................................36

C. Ramirez Najera's contentions concerning Experian's post-dispute reporting procedures fail as a matter of law. ....................................44

III. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO EXPERIAN ON RAMIREZ NAJERA'S REINVESTIGATION CLAIMS UNDER § 1681i. .......................................... 47

A. Experian reasonably reinvestigated Ramirez Najera's first dispute. ..........................................................................................47

B. Ramirez Najera is not entitled to summary judgment with respect to the second dispute. ..............................................................49

IV. THE DISTRICT COURT CORRECTLY HELD THAT RAMIREZ NAJERA COULD NOT SHOW ANY VIOLATION WAS WILLFUL. ..... 50

A. The district court applied the correct standard. ....................................50

B. There is no evidence Experian's matching procedures willfully violate § 1681e(b). ........................................................................51

C. There is no evidence Experian's reinvestigations willfully violated § 1681i(a). .......................................................................52

CONCLUSION ..........................................................................................55

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Apodaca v. Discover Fin. Servs.*,
417 F. Supp. 2d 1220 (D.N.M. 2006) .................................................40

*Bacharach v. Suntrust Mortg. Inc.*,
827 F.3d 432 (5th Cir. 2016) .................................................30

*Bagby v. Experian Info. Sols., Inc.*,
162 F. App'x 600 (7th Cir. 2006) .................................................47

*Barron v. Equifax Info. Servs., L.L.C.*,
802 F. App'x 161 (5th Cir. 2020) .................................................6, 33, 47

*Boggio v. USAA Fed. Sav. Bank*,
696 F.3d 611 (6th Cir. 2012) .................................................48

*Brady v. Fort Bend Cnty.*,
145 F.3d 691 (5th Cir. 1998) .................................................25

*Bryant v. TRW, Inc.*,
689 F.2d 72 (6th Cir. 1982) .................................................31

*Cameron v. Greater New Orleans Fed. Credit Union*,
713 F. App'x 238 (5th Cir. 2018) .................................................17, 32, 33, 53

*Condrey v. SunTrust Bank of Georgia*,
431 F.3d 191 (5th Cir. 2005) .................................................20

*Cousin v. Trans Union Corp.*,
246 F.3d 359 (5th Cir. 2001) .................................................24, 27

*Crabill v. Trans Union, L.L.C.*,
259 F.3d 662 (7th Cir. 2001) .................................................33, 36

*Daugherty v. Ocwen Loan Servicing, LLC*,
701 F. App'x 246 (4th Cir. 2017) .................................................48

*Exelon Wind 1, L.L.C. v. Nelson*,
766 F.3d 380 (5th Cir. 2014) ....................................................................45

*F.T.C. v. TRW Inc.*,
784 F. Supp. 361 (N.D. Tex. 1991) ...........................................................41

*Fahey v. Experian Info. Sols., Inc.*,
571 F. Supp. 2d 1082 (E.D. Mo. 2008) ..................................................39, 40

*Fraase v. Advantage Credit Bureau*,
179 F.4th 654 (8th Cir. 2026) ....................................................................39

*Garrett v. Experian Info. Sols., Inc.*,
785 F. Supp. 3d 1077 (N.D. Fla. 2025) ..................................................35, 39

*Hammer v. Equifax Info. Servs., L.L.C.*,
974 F.3d 564 (5th Cir. 2020) ..................................................................5, 33

*Hinkle v. Midland Credit Mgmt., Inc.*,
827 F.3d 1295 (11th Cir. 2016) ..................................................................48

*Hitt v. Connell*,
301 F.3d 240 (5th Cir. 2002) ....................................................................25

*Kariuki v. Tarango*,
709 F.3d 495 (5th Cir. 2013) ................................................................20, 21

*Koerner v. CMR Constr. & Roofing, L.L.C.*,
910 F.3d 221 (5th Cir. 2018) ....................................................................20

*Lloyd v. FedLoan Servicing*,
105 F.4th 1020 (8th Cir. 2024) ..................................................................47

*Losch v. Nationstar Mortg. LLC*,
995 F.3d 937 (11th Cir. 2021) ..................................................................30

*Marchisio v. Carrington Mortg. Servs., LLC*,
919 F.3d 1288 (11th Cir. 2019) ..................................................................53

*McClelland v. Experian Info. Sols., Inc.*,
2006 WL 2191973 (N.D. Ill. July 28, 2006) ......................................38, 39, 49

*Morris v. Trans Union LLC*,
224 F. App'x 415 (5th Cir. 2007) ....................................................................47

*Morris v. Trans Union LLC*,
420 F. Supp. 2d 733 (S.D. Tex. 2006)...............................................................47

*Pedro v. Equifax, Inc.*,
868 F.3d 1275 (11th Cir. 2017) ........................................................................31

*Picou v. City of Jackson, MS*,
48 F. App'x 102, 2002 WL 31016468 (5th Cir. 2002).......................................25

*Quest Med., Inc. v. Apprill*,
90 F.3d 1080 (5th Cir. 1996) ............................................................................32

*Ragas v. Tenn. Gas Pipeline Co.*,
136 F.3d 455 (5th Cir. 1998) ............................................................................27

*Reeves v. Equifax Info. Servs., LLC*,
2010 WL 2036661 (S.D. Miss. May 20, 2010) ..................................................54

*Reyes v. Equifax Info. Servs., L.L.C.*,
140 F.4th 279 (5th Cir. 2025) .......................................................................5, 47

*Richardson v. Oldham*,
12 F.3d 1373 (5th Cir. 1994) ............................................................................20

*Ricketson v. Experian Info. Sols., Inc.*,
266 F. Supp. 3d 1083 (W.D. Mich. 2017) .........................................................54

*Rydholm v. Equifax Info. Servs. LLC*,
44 F.4th 1105 (8th Cir. 2022) ...........................................................................34

*Safeco Ins. Co. of Am. v. Burr*,
551 U.S. 47 (2007)......................................................................6, 50, 51, 52

*Sarver v. Experian Info. Sols.*,
390 F.3d 969 (7th Cir. 2004) ............................................................................34

*Scott v. Harris*,
550 U.S. 372 (2007)................................................................... 16, 21, 26, 27

*Sepulvado v. CSC Credit Servs., Inc.*,
158 F.3d 890 (5th Cir. 1998) ....................4, 5, 33

*Smith v. Santander Consumer USA, Inc.*,
703 F.3d 316 (5th Cir. 2012) ....................32

S*tevenson v. TRW Inc.*,
987 F.2d 288 (5th Cir. 1993) ....................31

*Thompson v. San Antonio Retail Merchants Ass'n*,
682 F.2d 509 (5th Cir. 1982) ....................5, 33

*Topalian v. Ehrman*,
954 F.2d 1125 (5th Cir. 1992) ....................28

*United States v. Wyche*,
2007 WL 2436098 (5th Cir. Aug. 21, 2007) ....................28

*Vadie v. Miss. State Univ.*,
218 F.3d 365 (5th Cir. 2000) ....................24

*Wagner v. BellSouth Telecommunications, Inc.*,
520 F. App'x 295 (5th Cir. 2013) ....................24, 25, 27

**Statutes:**

15 U.S.C. § 1681e(b) .................... 5, 6, 13, 15, 16, 17, 18, 19, 21, 26, 28, 33, 34, 36, 40, 42, 43, 44, 45, 46, 51, 52

15 U.S.C. § 1681i.................... 1, 5, 6, 13, 14, 17, 18, 19, 21, 25, 26, 44, 45, 46, 47

15 U.S.C. § 1681i(a) ....................47, 48, 53

15 U.S.C. § 1681i(a)(1)(A) ....................5

15 U.S.C. § 1681i(a)(5)(A) ....................5

15 U.S.C. § 1681n....................6, 13

15 U.S.C. § 1681n(a) ....................6, 50

15 U.S.C. § 1681*o*....................6, 13

15 U.S.C. § 1681*o*(a)(1) .......... 6

15 U.S.C. § 1681p .......... 1

15 U.S.C. § 1681s-2 .......... 5

15 U.S.C. § 1681s-2(b) .......... 48

28 U.S.C. § 1291 .......... 1

28 U.S.C. § 1331 .......... 1

**Legislative and Regulatory Materials:**

86 Fed. Reg. 62,468 (Nov. 10, 2021) .......... 43

S. Rep. No. 104-185 (1995) .......... 35

## STATEMENT REGARDING JURISDICTION

This case arises under the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA"). The district court had jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether the district court correctly granted Experian summary judgment because Ramirez Najera lacks competent evidence that the alleged FCRA violations caused him actual damages.

2. Whether the district court correctly granted Experian summary judgment on Ramirez Najera's claims under 15 U.S.C. § 1681e because Experian's reporting procedures are not unreasonable as a matter of law.

3. Whether the district court correctly granted Experian summary judgment on Ramirez Najera's claims under 15 U.S.C. § 1681i because Experian's response to the first dispute he raised was not unreasonable as a matter of law, and because he lacks evidence of actual damages causally connected to either reinvestigation.

4. Whether the district court correctly granted Experian summary judgment on Ramirez Najera's claims that Experian willfully violated FCRA.

## INTRODUCTION

Experian, a credit reporting agency, matched Plaintiff Victor Manuel Ramirez Najera to two mortgage accounts belonging to his father, Victor Manuel Ramirez, who had the same home address. Because FCRA is not a strict liability statute, Experian cannot be liable just for making that mistake. Instead, Ramirez Najera must establish that Experian acted *unreasonably* in making that mistake, and then failed to conduct *reasonable* reinvestigations after he disputed the accuracy of his credit report.

On appeal, Ramirez Najera confusingly begins by addressing damages, arguing the district court erred by holding he cannot prove actual damages caused by the alleged FCRA violations. But the threshold liability questions mostly resolve Ramirez Najera's claims: as the district court held, Experian's initial matching process and its reinvestigation when Ramirez Najera first disputed his credit report were reasonable as a matter of law. While the district court did not hold that Experian's reinvestigation when Ramirez Najera disputed his credit report a second time was reasonable, Ramirez Najera faces a different problem with respect to that dispute—nearly all his allegedly corroborating evidence of "actual damages" predates the dispute, and so lacks any causal connection to that dispute.

In any case, the district court's reasoning with respect to damages was correct. Ramirez Najera claims that the understandable mix-up between him and his father

caused him compensable emotional distress, but the objective evidence shows that the error was entirely immaterial—it actually *improved* Ramirez Najera's credit score. The district court correctly held that no reasonable jury could find that such a minor issue caused anyone compensable emotional distress. The district court also properly ruled that Ramirez Najera could not show any economic damages, because he has no evidence of credit applications that were denied because of the alleged FCRA violations. And the "reputational" and "lost time" damages he claims on appeal do not comprise "actual damages" under FCRA.

Ramirez Najera's contentions also fail with respect to the threshold liability questions. First, it was not unreasonable for Experian to initially match Ramirez Najera's father's mortgage accounts to Ramirez Najera, given all the similarities between the two men. Federal and state regulators repeatedly have acknowledged that credit reporting agencies ("CRAs") require flexible matching procedures, such as those Experian employed here, to avoid creating "fragmented" or "incomplete" credit files.

As for Ramirez Najera's reinvestigation claims, the district court correctly held that Experian did not act unreasonably in reinvestigating Ramirez Najera's first dispute. Experian responded to that dispute by reaching back out to the financial institutions that had furnished the information—a process this Court has held is reasonable. While the district court did not find (under the summary judgment

standard) that Experian's reinvestigation of Ramirez Najera's second dispute was reasonable, summary judgment still was proper because, as noted, Ramirez Najera lacks evidence of actual damages caused by Experian's handling of that dispute.

Finally, the district court correctly granted Experian summary judgment on Ramirez Najera's claim that Experian's alleged FCRA violations were willful. Contrary to Ramirez Najera's argument on appeal, the district court considered whether Experian's conduct was either a knowing or reckless violation of FCRA. Ramirez Najera has no evidence showing that, even if Experian violated FCRA, it did so willfully.

The Court should affirm summary judgment for Experian.

## STATEMENT OF THE CASE

### I. STATUTORY AND REGULATORY BACKGROUND.

FCRA "requires consumer reporting agencies [to] adopt reasonable procedures for meeting the needs of commerce for consumer credit ... in a manner which is fair and equitable to the consumer." *Sepulvado v. CSC Credit Servs., Inc.*, 158 F.3d 890, 895 (5th Cir. 1998) (citation modified). The statute "defines a complex set of rights and obligations that attend the relationships among and between the provider of a credit report, the user of that information[,] and the consumer who is made the subject of such a report." *Id.* It also regulates the "furnishers" of information to CRAs, such as lenders, requiring them to supply

CRAs with accurate information. *E.g.*, 15 U.S.C. § 1681s-2 ("A person shall not furnish any information relating to a consumer to any consumer reporting agency if the person knows or has reasonable cause to believe that the information is inaccurate").

As relevant here, 15 U.S.C. § 1681e(b) requires CRAs to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." This provision "does not hold a CRA strictly liable for all inaccuracies." *Hammer v. Equifax Info. Servs., L.L.C.*, 974 F.3d 564, 568 (5th Cir. 2020). While an inaccuracy is required to state a claim under § 1681e(b), an inaccuracy alone does not give rise to liability. That would effectively provide for strict liability and rewrite the statute Congress enacted. *See Sepulvado*, 158 F.3d at 896. The reasonableness of a CRA's reporting procedures is judged against what "a reasonably prudent person would do under the circumstances." *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509, 513 (5th Cir. 1982).

When consumers dispute the accuracy of a CRA's report, 15 U.S.C. § 1681i requires the CRA to "conduct a reasonable reinvestigation" and to correct or delete information found to be inaccurate. *Id.* § 1681i(a)(1)(A), (a)(5)(A). To prevail on a claim under this provision, plaintiffs must show an inaccuracy and that the CRA's reinvestigation was unreasonable. *Reyes v. Equifax Info. Servs., L.L.C.*, 140 F.4th

279, 286 (5th Cir. 2025). Just as § 1681e(b) does not mandate any particular reporting procedure, § 1681i does not require any particular type of reinvestigation. *Barron v. Equifax Info. Servs., L.L.C.*, 802 F. App'x 161, 162 (5th Cir. 2020).

Plaintiffs may pursue claims under § 1681e(b) and § 1681i on a negligence theory of liability under § 1681*o*, and a willfulness theory of liability under § 1681n. If a CRA is merely negligent in fulfilling its statutory obligations, liability is cabined to "actual damages sustained by the consumer as a result of the failure." 15 U.S.C. § 1681*o*(a)(1). Section 1681n permits statutory and enhanced remedies, but only where a CRA "willfully fails to comply" with FCRA. 15 U.S.C. § 1681n(a). A CRA acts willfully when it either knowingly or recklessly violates FCRA. *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007).

## II. FACTUAL BACKGROUND.

### A. Experian and its FCRA procedures.

1. Experian, as a CRA, "does not originate or create any credit information" but instead "stores data supplied by" furnishers in a database. ROA.1178(¶8), Cave Decl. Experian's database "does not store complete or compiled consumer credit reports but instead stores all elements of consumer data in tables linked" to Personal Identification Numbers ("PIN") for individual consumers. ROA.3568(¶7), Cave Decl. Experian strives to assign each consumer only one PIN. ROA.1995:4-5, Iwanski Depo.

Before accepting data from furnishers into its database, Experian conducts a thorough vetting of the furnishers' businesses and requires them to execute contracts. ROA.885-886, Methvin Report. The credit data that furnishers provide includes available personal identifying information—like name, address, social security number ("SSN"), and date of birth—which Experian uses to link credit information to the appropriate consumer PIN. ROA.4596:3-4597:4, Iwanski Depo.

After Experian receives credit data, but before it matches the data to a particular consumer, the data are "subjected to rigorous manual and automated quality control and statutory compliance procedures." ROA.886, Methvin Report; ROA.1179(¶11), Cave Decl. These procedures include automated controls to detect possible errors, like "obviously inaccurate" or logically inconsistent data (*e.g.*, origination dates in the future), and variations in a furnisher's reporting over time. ROA.886, Methvin Report; ROA.1179(¶11)-1180(¶12), Cave Decl. The data are then run through Experian's proprietary matching algorithm to find an appropriate consumer "match." ROA.3568(¶8), Cave Decl. This proprietary algorithm compares, analyzes, and matches any identifying information obtained from a furnisher to consumer identifying information linked to credit items in Experian's database. ROA.886, Methvin Report.

Importantly, Experian's algorithm "does not require perfect matches" between the identification information furnishers provide and that in Experian's

system. ROA.3572(¶26), Cave Decl. This flexibility allows Experian to account for variations in data resulting from errors—for example, typos and similar data entry mistakes—introduced by the consumer or the furnisher in the credit-application process. *Id.* It also accounts for the fact that most consumers change addresses over time, and their names may change over time as well (*e.g.*, as the result of a marriage or divorce). ROA.887-888, Methvin Report. Experian's flexible matching is an effort to avoid generating "incomplete or fragmented files," which diminish the accuracy of consumer credit reports by omitting credit information that should be linked to a consumer. ROA.1180(¶13), Cave Decl.

2. Consistent with FCRA, Experian maintains procedures to address consumer disputes over the accuracy of their credit reports. Experian's consumer assistance operation is staffed with dispute agents who are extensively trained to assist consumers with a variety of credit-report issues. ROA.895, Methvin Report. Consumers may submit disputes to Experian by telephone, mail, and electronically through a web portal. *Id.*

How Experian responds to a particular dispute depends on the type of dispute raised and the amount of information the consumer provides. For example, if a consumer complains that an account does not belong to him, without more information, then the dispute will be coded as "not mine." ROA.4535:23-4536:3, Iwanski Depo. While there are different variations of "not mine" disputes, many are

reinvestigated using Automated Consumer Dispute Verifications ("ACDVs"). ROA.4525:8-17. ACDVs are automated electronic forms initiated by Experian and routed to the appropriate furnisher for review, update, or verification of the disputed credit information. ROA.2571. When furnishers return their ACDV responses, a dispute agent reviews the response and, if the furnisher responds "account information is accurate," with no changes in identification information, the credit information will remain on the consumer's report. ROA.6319:6-12, Morales Depo.

Experian does not utilize ACDVs for every type of consumer dispute. For example, it does not use them for disputes that trigger its "Not-Mine–Date of Birth Policy." This policy triggers when a consumer states that an account does not belong to him because he was not alive or a minor when it was opened, and provides proof of date of birth. Plaintiff's Tab 11, RE 87; ROA.2009:10-2010:13, Iwanski Depo. Taken together, these factors may indicate that the consumer's credit file has been "mixed" or "merged" with credit information belonging to another consumer. ROA.6115:4-6, Avalos Depo.

This type of mixed-file case is not normally routed to ACDVs but instead is escalated to Experian "mixed train agent[s]." ROA.2114:4-8, Iwanski Depo. The agents should then delete the credit information from the consumer's credit report. *Id.* Agents also are trained to place a "Do Not Combine" notation on the consumer's file. ROA.2113:23-2114:3. When that "DNC" notation is placed, an exact SSN

match is required before accounts are matched. ROA.896, Methvin Report. While DNCs reduce the chance of subsequent mixing, they also make it more difficult to ensure completeness of a consumer's credit report, should later credit applications not "contain exact and complete" identifying information. *Id.* For that reason, Experian applies DNCs only once it has confirmed a mixed file. *Id.*

### B. Ramirez Najera's FCRA disputes.

Plaintiff is Victor Manuel Ramirez Najera, the son of Victor Manuel Ramirez. ROA.3570-3571(¶¶17-19), Cave Decl. Both Victor Manuel Ramirez Najera and Victor Manuel Ramirez have used the same home address in Fort Worth, Texas when applying for credit. ROA.3571(¶¶20-21). Making matters more confusing, Victor Manuel Ramirez Najera sometimes does not use his second last name in documents and does not use a generational identifier, meaning his credit applications sometimes use the very same name as his father. ROA.1328, AppFolio Report; ROA.1225:7-12, Plaintiff's Depo. And making matters more confusing yet, Plaintiff's father does not have an SSN. ROA.892-893, Methvin Report. Thus, there are credit applications for individuals with the shared name Victor Manuel Ramirez using the same Texas address, and CRAs cannot always use an SSN to distinguish between father and son. *Id.*

Due to this confusing set of circumstances, Ramirez Najera's credit file at Experian became "mixed" with information belonging to his father. This came to

light in May 2023, when Ramirez Najera applied for an apartment in Nashville, Tennessee. The property manager ordered a tenant screening report from AppFolio, Inc., which drew on information from Experian. ROA.1330-1331, AppFolio Report. The report correctly identified three "negative" credit accounts indisputably belonging to Ramirez Najera, including a collection account, an account with a past-due balance, and a charged-off account. *Id.* But it also mistakenly included two mortgage accounts belonging to Ramirez Najera's father: one with Rushmore Loan Management Services, LLC, and another with PennyMac Loan Services, LLC. *Id.* Ramirez Najera's rental application was denied, but there is no evidence in the record as to why—whether due to Ramirez Najera's own negative accounts or his father's mortgage accounts.

Ramirez Najera disputed the accuracy of the mortgage accounts on February 12, 2024—about nine months after his rental application was denied. ROA.1265, Plaintiff's Responses to RFAs. He made his first dispute to Experian by phone, stating only "Um. It's not mine." ROA.1841, First Dispute Recording; ROA.6444, Experian's MSJ Opposition (call transcription). He provided no additional information, including no facts tending to show that the accounts were not actually his. In response, the dispute agent sent ACDVs to Rushmore and PennyMac. ROA.1275-1276, ACDVs.

PennyMac's ACDV response purported to confirm the accuracy of its

account. ROA.1276. PennyMac's response, however, included identifying information that did not match Ramirez Najera's. *Id.* Experian accordingly deleted the PennyMac account. ROA.1278, First Dispute Results Letter. Rushmore's ACDV response also confirmed the accuracy of its account, but unlike PennyMac, it returned identifying information consistent with Ramirez Najera's. ROA.1275. Experian promptly informed Ramirez Najera of the dispute's outcome, advising him on March 7, 2024, it had deleted the PennyMac account but that the Rushmore account would remain. ROA.1278, First Dispute Results Letter.

About four months later, in July 2024, Ramirez Najera submitted a second, written dispute to Experian, again seeking removal of the Rushmore account. ROA.1241-1256, Second Dispute Letter. This time, he explained that the account belonged to his father and provided information showing he was 13 years old when the mortgage was originated. *Id.* It is undisputed that this second dispute contained sufficient information to bypass an ACDV and be routed to a mixed train agent under Experian's policies. But, as the dispute agent who reviewed the dispute explained, he mistakenly sent another ACDV to Rushmore. ROA.1285(¶¶5-8), Avalos Decl. Rushmore again verified the account, and the account remained on Ramirez Najera's report. ROA.5111, Second Rushmore ACDV; ROA.5113, Second Dispute Results Letter. Experian ultimately removed it in June 2025 after receiving a third dispute. ROA.1296-1297, Third Dispute; ROA.1299, Third Dispute Results.

## III. PROCEDURAL HISTORY.

### A. Ramirez Najera sues Experian and the parties move for summary judgment.

After Ramirez Najera's second dispute, but before the third dispute, Ramirez Najera sued Experian, AppFolio, and Rushmore. ROA.22, Complaint. He asserted two counts under FCRA against Experian—one alleging violations of § 1681e(b) for failing to follow reasonable reporting procedures and another alleging that Experian violated § 1681i by failing to conduct reasonable reinvestigations in response to his two disputes. ROA.51-55(¶¶152-169). With respect to both counts, Ramirez Najera claimed negligence under § 1681*o* and willfulness under § 1681n. *Id.*

Following discovery, the parties both moved for summary judgment. Experian sought summary judgment in full, arguing that its matching procedures and reinvestigation of the first dispute were reasonable under FCRA. ROA.1147-1155, Experian's MSJ Brief. Experian further argued that, even if its matching procedures and reinvestigations were unreasonable, summary judgment was proper because Ramirez Najera lacks competent evidence of actual damages caused by the alleged violations. ROA.1160-1169. Experian also sought summary judgment on Ramirez Najera's claims that the alleged violations were willful. ROA.1155-1160.

Ramirez Najera sought partial summary judgment with respect to liability on his claims, on both negligence and willfulness grounds, and on the existence (but not the amount) of damages. ROA.1500-1547, Plaintiff's MSJ Brief. For his § 1681e(b)

claim, Ramirez Najera complained that Experian's matching system is unreasonable to the extent it can match consumers to credit accounts based on a matching name and address, without also requiring a matching SSN or date of birth. ROA.1518-1529. He argued that this alleged FCRA violation was willful, claiming that Experian should have known, based on proceedings against an Experian predecessor in the early 1990s, that its matching practices create an "unjustifiably high risk of harm." ROA.1544-1545. Ramirez Najera further contended that no reasonable jury could find Experian followed reasonable reporting procedures when it continued to prepare and furnish new credit reports including the Rushmore account after receiving Ramirez Najera's second dispute. ROA.1528.

On his § 1681i claim, Ramirez Najera argued that Experian's reinvestigation of his first dispute was unreasonable because the dispute agent should have asked follow-up questions before sending ACDVs. ROA.1529-1536. As to the second dispute, Ramirez Najera relied on Experian's concession that the dispute agent departed from Experian's "Not Mine–Date of Birth" procedure. ROA.1536-1537. Ramirez Najera claimed this was a willful violation based on the same decades-old proceedings involving an Experian predecessor. ROA.1545.

Ramirez Najera asserted that Experian's purported FCRA violations caused him three categories of actual damages. First, he claimed economic damages based on his belief that Experian's inaccurate reporting caused the denial of his apartment-

rental application. ROA.1543. Second, he claimed damages for the "lost time" spent preparing his second dispute. ROA.1544. And third, he claimed emotional-distress damages, asserting that explaining the mix-up to third parties was the "most embarrassing thing that's happened" to him, and that anxiety from the alleged FCRA violations led to an emergency room visit on March 5, 2024. ROA.1543-1544; ROA.1701:12-14, Plaintiff's Depo. Notably, that visit occurred *before* he received the reinvestigation results for his first dispute on March 7, and *before* he submitted his second dispute in July 2024. ROA.1278, First Dispute Results Letter; ROA.1241-1256, Second Dispute Letter.

### B. The district court grants summary judgment to Experian.

The district court granted Experian's motion and denied Ramirez Najera's.

The court first addressed Ramirez Najera's § 1681e(b) claim. It rejected his argument that Experian willfully violated FCRA by linking accounts to consumers without a matching SSN or date of birth. ROA.7274-7275, Opinion. As the court explained, this Court "has not held that failing to require" a matching SSN or date of birth willfully violates FCRA. ROA.7275. The court also rejected Ramirez Najera's argument, premised on consent orders and cases from the 1990s, that Experian had been on notice that its matching procedures are "harmful." *Id.* It is undisputed that Experian has since twice updated those procedures. *Id.*

The district court then rejected Ramirez Najera's argument that Experian's

matching in this case was negligent. ROA.7275-7277. It reasoned that matching Ramirez Najera's father's accounts to him was not unreasonable because "the identifying information they both used on their credit applications was the same." *Id.* "Considering the vast amount of information [Experian's] database sorts through and the flexibility required to match accounts to consumers"—including those without SSNs like Ramirez Najera's father—"[Experian's] procedures are not rendered unreasonable due to matching accounts without considering [SSNs] when other identifying information matches." *Id.*

The district court further found that Ramirez Najera failed to show damages linked to his § 1681e(b) claim. ROA.7277-7281. As the court explained, Ramirez Najera lacked evidence that Experian's reporting of the mortgage accounts, rather than his three other negative accounts, caused the denial of his apartment application or any other denial of credit. *Id.* As for emotional distress, the court acknowledged Ramirez Najera's evidence that he had been suffering from emotional distress for *some* reason. *Id.* But while Ramirez Najera tried linking this distress to the mere inclusion of his father's accounts on his credit report—the basis for the § 1681e(b) claim—the court explained that "no reasonable jury could believe" that the mistake was "the most embarrassing thing that's happened" to him. *Id.* (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). As the court noted, Experian's reporting of the Rushmore account actually *improved* Ramirez Najera's overall creditworthiness,

since his credit score *dropped* when Experian removed the account. *Id.* This was objective evidence that the mixed credit file was simply no big deal—nothing capable of causing compensable emotional distress.

The court next addressed the § 1681i reinvestigation claim. As to the first dispute, it held that Experian's reliance on ACDVs was not unreasonable, where Ramirez Najera provided Experian no information supporting his assertion that the accounts were not his. ROA.7281-7283. As to the second dispute, the court did not find that Experian's reinvestigation was reasonable, given Experian's concession that its dispute agent failed to follow internal procedures. ROA.7283-7284. The court held, however, that Ramirez Najera's claim still failed because he could not show any causally-connected damages. *Id.*

Finally, as to Ramirez Najera's claim that Experian's reinvestigations willfully violated FCRA, the court relied on this Court's precedent holding that any purported "failure to adequately investigate and swiftly correct inaccurate information generally does not constitute a willful violation." ROA.7284-7285 (quoting *Cameron v. Greater New Orleans Fed. Credit Union*, 713 F. App'x 238, 240 (5th Cir. 2018)). It declined to find that Experian was on notice that its reinvestigation procedures were inadequate. *Id.* And it found that the dispute agent's departure from procedure did not amount to a willful violation. *Id.*

Ramirez Najera timely appealed. ROA.7288, NOA.

## SUMMARY OF ARGUMENT

I. Ramirez Najera begins his brief by discussing damages. That focus obscures the threshold liability issue—damages matter only if Ramirez Najera can first establish a violation of FCRA. The district court held that he could not show a violation of § 1681e(b), or that Experian's reinvestigation of the first dispute violated § 1681i.

Nearly all of Ramirez Najera's claimed corroborating evidence of emotional-distress damages predates Experian's resolution of his first dispute, and his submission of his second dispute. The remaining evidence does not rise to the level of emotional distress as a matter of law. That leaves his § 1681e(b) claim concerning Experian's initial matching, but no reasonable jury could find that this objectively immaterial credit reporting error would cause anyone emotional distress. Nor did Ramirez Najera present evidence that Experian caused any economic damages compensable under FCRA.

II. The district court correctly granted Experian summary judgment on Ramirez Najera's claim that Experian's matching procedures violated § 1681e(b). Experian's procedures are not unreasonable as a matter of law. The mixed file does not show otherwise. Ramirez Najera and his father used *identical* names and addresses on their credit applications, and his father lacked an SSN that could have provided an additional distinguishing identifier. FCRA does not require CRAs to

match accounts only when SSNs and birthdates align. Both regulators and courts have recognized that CRAs face the unenviable task of balancing FCRA's competing goals of accuracy and completeness. For those reasons, courts confronting analogous situations have found similar matching procedures reasonable as a matter of law.

Ramirez Najera's effort to recast his § 1681i reasonable reinvestigation allegations as a § 1681e(b) challenge to Experian's "post-dispute reporting procedures" is meritless. Once a dispute is raised, § 1681i provides the statutory framework governing reinvestigation and removal of the challenged information—not § 1681e(b).

III. There is no evidence Experian acted unreasonably in failing to remove the Rushmore account after Ramirez Najera raised his first dispute, and there are no damages that can be attributed to Experian's non-removal of that account after his second dispute. As to the first dispute, Experian reasonably relied on the ACDV process to reinvestigate. As for the second dispute, Ramirez Najera cannot prove causation or actual damages. His alleged corroborating evidence of emotional distress, such as the hospital visit records, predates the second dispute. Without corroborating evidence connecting that reinvestigation to any compensable injury, Ramirez Najera's claim cannot survive.

IV. The district court correctly rejected Ramirez Najera's claim that

Experian willfully violated FCRA. The court did not ignore the recklessness standard as Ramirez Najera argues. Nothing in the record would permit a reasonable jury to conclude that Experian knowingly or recklessly violated FCRA. The authorities on which Ramirez Najera relies do not establish that Experian's matching procedures are unlawful, much less that they create an obvious and unjustifiably high risk of violating FCRA. Nor does the record support a finding that the dispute agent's acknowledged mistake in sending a second ACDV was anything more than an isolated human error—which as a matter of law is not enough for willfulness.

## STANDARD OF REVIEW

This Court reviews "summary judgment de novo, applying the same legal standards as the district court." *Condrey v. SunTrust Bank of Georgia*, 431 F.3d 191, 197 (5th Cir. 2005). The question is whether "the record, taken as a whole, could ... lead a rational trier-of-fact to find for the non-moving party." *Kariuki v. Tarango*, 709 F.3d 495, 501 (5th Cir. 2013). Courts must not make credibility determinations, *Richardson v. Oldham*, 12 F.3d 1373, 1379 (5th Cir. 1994), and all facts and inferences typically must be viewed in the light most favorable to the non-moving party, *Koerner v. CMR Constr. & Roofing, L.L.C.*, 910 F.3d 221, 227 (5th Cir. 2018). Those rules notwithstanding, "[s]elf-serving allegations are not the type of significant probative evidence required to defeat summary judgment," and "vague or conclusory" testimony cannot "create a genuine issue of material fact in the face

of conflicting probative evidence." *Kariuki*, 709 F.3d at 505 (citation modified). Thus, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ... summary judgment." *Scott*, 550 U.S. at 380.

## ARGUMENT

### I. RAMIREZ NAJERA'S DAMAGES ARGUMENTS ARE NO BASIS TO OVERTURN THE DECISION BELOW.

#### A. By leading with his damages arguments and ignoring the relative timing of events, Ramirez Najera confuses the issues on appeal.

Ramirez Najera's lead argument (at 17-35) is that the district court erred by holding he lacked sufficient evidence of actual damages to survive summary judgment. But damages only matter if he proves a FCRA violation *first*.

Here, the district court found as a matter of law that Ramirez Najera had *not* established a FCRA violation on two of his three theories of liability: that Experian violated § 1681e(b) by initially connecting the mortgage accounts to his file in 2023, and that Experian violated § 1681i with respect to its resolution of the first dispute, which Ramirez Najera raised on February 12, 2024, and which Experian resolved on March 7, 2024. *See supra*, pp. 11-12. As explained below, Ramirez Najera cannot show that the district court's finding of no liability on those two theories was wrong. *See infra*, pp. 33-49. That means damages do not matter for those two

theories—the Court can affirm without ever reaching Ramirez Najera's damages arguments.

The district court did not find that Experian's reinvestigation of Ramirez Najera's second dispute was reasonable as a matter of law. But for that dispute the *timing* of events is crucial. Yet Ramirez Najera's lengthy damages argument never addresses *when* the second dispute occurred in relation to his alleged evidence of actual damages—it jumbles the discussion of the three alleged violations and alleged damages together, without any mention of dates.

To clarify, and as recounted above, Ramirez Najera did not present the second dispute until July 2024. That is case dispositive, because Ramirez Najera has no evidence of corroborated actual damages from *after* Experian's resolution of that dispute. For example, his apartment application was denied in 2023, his emergency-room visit was in March 2024, and the time he spent preparing his second dispute was necessarily *before* he submitted it in July 2024. *See supra*, pp. 10-12, 14-15. It is therefore *impossible* for the alleged failures in Experian's second reinvestigation to have caused *any* of those alleged damages. Ramirez Najera's brief completely glosses over that impossibility.

Ramirez Najera repeatedly cites a declaration from a mortgage-loan originator, Jay Jones, to support his claim of emotional distress, and that declaration does concern events in April 2025, after the second dispute. ROA.6420-6421, Jones

Decl. But Ramirez Najera's description of that declaration distorts it beyond recognition. Jones did not testify, as Ramirez Najera claims (at 20), that "he observed Plaintiff's distress," and he describes nothing close to emotional distress; he only offered the hearsay that "Mr. Ramirez Najera made it clear that he was *very concerned* about the problems that the Rushmore account being reported by Experian may cause with respect to his mortgage application." ROA.6421(¶7) (emphasis added). A statement of "concern" is not emotional distress. *See infra*, p. 24. And Jones did not testify that the Rushmore account caused any *actual* problems, as Ramirez Najera repeatedly suggests (at 20, 27-28, 33-35). He merely recounted that he told Ramirez Najera that manual underwriting was "very likely," with no evidence that manual underwriting actually occurred, and no evidence that, even if it did occur, it had any financial impact. ROA.6422(¶8).

Ramirez Najera also cites testimony by his fiancée, who describes events after the July 2024 second dispute. But as explained below, her testimony does not tie anything rising to the level of emotional distress to Experian's resolution of the second dispute in July 2024. *Infra*, pp. 28-29.

For these reasons, Ramirez Najera's focus on damages as his lead argument is a confusing sideshow. Resolution of the damages issues is unnecessary to affirm judgment for Experian on Ramirez Najera's first two theories of liability. And his proffered damages evidence cannot support his third theory of liability, either.

### B. Summary judgment to Experian on Ramirez Najera's claims of emotional-distress damages was proper.

Ramirez Najera's lead damages argument (at 19-30) is that he had sufficient evidence of emotional-distress damages to survive summary judgment. He did not. He lacked evidence of anything resembling compensable emotional distress *after* the second dispute in July 2024, and the district court correctly held that his evidence of emotional distress from *before* July 2024 was insufficient to get to a jury on his other two theories of liability.

There is a high bar for proving compensable "emotional distress." As this Court has explained, "hurt feelings, anger and frustration are part of life," and a legal system allowing for compensation of such everyday frictions would be unworkable. *Vadie v. Miss. State Univ.,* 218 F.3d 365, 376 (5th Cir. 2000) (citation modified). In *Wagner v. BellSouth Telecommunications, Inc.*, 520 F. App'x 295, 299 n.5 (5th Cir. 2013), for example, this Court affirmed summary judgment for the defendant as to emotional-distress damages, where the plaintiff testified that "she lost sleep, was humiliated, and felt 'bad,' 'guilty,' and 'helpless.'" Likewise, in the FCRA case *Cousin v. Trans Union Corp*., 246 F.3d 359, 371 (5th Cir. 2001), the Court vacated a judgment for the plaintiff where he testified that an erroneous credit report made him "very upset," "angry," feeling "like nobody was listening," and "like being trapped inside" a maze.

Importantly, any evidence of emotional distress must be corroborated—a plaintiff's say-so is not enough. S*ee Brady v. Fort Bend Cnty.*, 145 F.3d 691, 720 (5th Cir. 1998) (concluding "uncorroborated" testimony could not "legally support mental anguish damages"); a*ccord Wagner*, 520 F. App'x at 298 (plaintiff's "own conclusory assertions about emotional distress ... are insufficient to support an emotional damages award"); *Hitt v. Connell*, 301 F.3d 240, 251 (5th Cir. 2002) (plaintiff's "'vague, conclusory, and uncorroborated" testimony "cannot legally support mental anguish damages"). Ramirez Najera claims (at 20-21) that his own testimony can be enough to defeat summary judgment, pointing to *Picou v. City of Jackson, MS*, 48 F. App'x 102, 2002 WL 31016468 (5th Cir. 2002), but *Picou* does not support him at all. Indeed, the Court there concluded that the plaintiff's testimony was "not sufficient evidence from which a reasonable jury could find emotional distress to support damages." *Id.* at *5.

Ramirez Najera argues (at 19-20) that he had "contemporaneous medical evidence"—the records of his emergency room visit—to corroborate his emotional-distress damages. Though that visit undeniably shows distress, it cannot help Ramirez Najera. First, as noted above, the emergency-room visit in March 2024 was four months *before* the July 2024 second dispute, so that alleged § 1681i violation could not have caused that distress. Second, the emergency-room visit also was *before* Ramirez Najera knew of Experian's resolution of the first dispute—the visit

was on March 5, *before* Experian resolved the first dispute on March 7. *Supra*, pp. 14-15. So that alleged § 1681i violation could not have caused the emotional distress Ramirez Najera was suffering on March 5 either.

That leaves Ramirez Najera to argue that Experian's alleged § 1681e(b) violation—the mere misattribution of Victor Manuel Ramirez's mortgage accounts to his son Victor Manuel Ramirez Najera in 2023—caused Ramirez Najera the emotional distress he reported in March 2024. The district court's holding that no reasonable jury could credit this theory was plainly correct.

To start, while Ramirez Najera testified that the account mix-up was the "most embarrassing thing that's happened" to him, the district court properly held that no reasonable jury could credit that testimony in light of the objective evidence: the fact that the misattribution actually caused Ramirez Najera's credit score to *increase* slightly. ROA.7280, Opinion (citing *Scott*, 550 U.S. at 380). As quoted above, "hurt feelings, anger and frustration" are not compensable emotional distress; something more dire is required. *Supra*, p. 24. The *positive* credit-score impact is objective evidence that the alleged § 1681e(b) violation was just a minor error, not the sort of significantly negative event that can cause distress rising to the level of compensable emotional distress.

Ramirez Najera argues (at 22-30) the district court could not discredit his testimony that the alleged § 1681e(b) violation caused his emotional distress,

asserting this case does not present the sort of conflict between witness testimony and objective evidence seen in *Scott*. That misunderstands the nature of the inquiry and of the district court's ruling. Ramirez Najera bears the burden of proof and, as discussed above, there is a high bar to establish *compensable* emotional distress. This Court repeatedly has held that losing sleep, and feelings of humiliation, helplessness, and being trapped are not enough, and has granted summary judgment and even vacaturs of judgments as a result. *Supra*, p. 24 (discussing *Wagner* and *Cousin*). The district court could properly decide that an objectively inconsequential error in a credit report cannot cause sufficiently severe embarrassment and anxiety to amount to compensable emotional distress. Any contrary rule would allow FCRA plaintiffs to easily get to a jury by exaggerating credit reporting molehills into emotional distress mountains.

Ramirez Najera argues (at 25-26, 27-28) that the lack of negative credit-score impact does not tell the whole story, because the Rushmore account may have hurt his creditworthiness in other ways, thus causing him emotional distress. But his argument here is all attorney argument—it lacks citations to the record showing that the mixed file actually caused Ramirez Najera such problems. *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (nonmovant must "identify specific evidence in the record" and explain how it supports the claim). Ramirez Najera's naked assertion of how his mortgage originator "will testify at trial," unsupported by

any record citations, is an improper basis on which to oppose summary judgment, let alone to support an appeal. *United States v. Wyche*, 2007 WL 2436098, at *2 (5th Cir. Aug. 21, 2007) (holding that if claimed testimony is "not included in the affidavit that is of record, it cannot be considered on appeal"). His reliance on extra-record "Guides" from Fannie Mae and Freddie Mac, which were not introduced or explained below, is similarly improper. *Topalian v. Ehrman*, 954 F.2d 1125, 1132 n.10 (5th Cir. 1992) ("This [C]ourt's inquiry is limited to the summary judgment record before the trial court: the parties cannot add exhibits[.]").

Ramirez Najera argues (at 29-30) the evidence that the mixed file improved his credit-score is irrelevant and meritless because it is from June 2025, while he was distressed in 2024. But he identifies no evidence, expert or otherwise, suggesting the impact of the Rushmore account on his credit score would have been any different in 2023 and 2024. Ramirez Najera is accordingly wrong (at 29) that the district court drew an impermissible inference for Experian by "conclud[ing] that the Rushmore [a]ccount would have [had] the same effect" in 2024. Ramirez Najera bears the burden of proof, and he has no proof that the Rushmore account was objectively negative at *any* point in time.

Notably, Ramirez Najera's own testimony confirms the district court's ruling that his emotional distress cannot have been caused by the mere § 1681e(b) violation. Specifically, he testified and argued below that his inability to get an apartment

caused his emotional distress. ROA.1604:16-1605:19, Plaintiff's Depo. His fiancée likewise tied his emotional distress to his inability to get an apartment: "He was really stressed out about us not being able to get an apartment." ROA.2688:14-15, Espinoza Depo. But the district court held that Ramirez Najera had no evidence that the misattribution of his father's mortgage accounts—rather than the three negative accounts indisputably belonging to Ramirez Najera—caused the denial of his apartment application, ROA.7278-7279, Opinion, and Ramirez Najera *does not challenge that ruling on appeal*. As a result, the allegedly corroborating testimony from the fiancée is now fatal to Ramirez Najera's case—it confirms that his distress was not caused by any FCRA violation, but by an application denial that Ramirez Najera cannot tie to anything Experian allegedly did wrong.

Ramirez Najera's remaining evidence also does not support his argument that the alleged FCRA violations caused him compensable emotional distress. As discussed above, his mortgage originator's declaration does not actually evidence emotional distress, only "concern." *See supra*, p. 23. Nor does his fiancée's testimony; other than her testimony about their inability to obtain an apartment, she testified only that Ramirez Najera displayed "anger," that he was "tired of still trying" to correct his credit report, and that he was "stressed out." ROA.2714:13-19, Espinoza Depo.; ROA.2639(¶14), Espinoza Decl. As a matter of law, none of that rises to the level of compensable emotional distress. *See supra*, p. 24.

### C. The district court properly ruled that Ramirez Najera could not show other forms of actual damages.

Ramirez Najera argues (at 30-34) the district court erred by overlooking evidence of reputational injury, lost time, and the impacts Experian's reporting had on a 2025 mortgage application. None of his arguments have merit.

1. Starting with the claimed reputational injuries, Ramirez Najera is mistaken (at 18, 31-32) that "false reporting is injurious *per se*," such that plaintiffs claiming reputational injuries "need not show any particular consequences" flowing from disclosure of erroneous information to third parties. He cites *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937 (11th Cir. 2021), but that case does not articulate such a rule. The relevant discussion in *Losch* concerns *Article III standing*, not the meaning of "actual damages" under FCRA. *Id.* at 943. *Losch* never states that the disclosure of inaccurate information standing alone—absent any showing of actual economic or emotional damages—entitles a plaintiff to recovery.

Ramirez Najera also points (at 31) to this Court's decision in *Bacharach v. Suntrust Mortg. Inc.*, 827 F.3d 432 (5th Cir. 2016), but that case does not help him either. *Bacharach* noted in passing that recovery might be had for "injury to one's reputation," but immediately clarified that, to be compensable under FCRA, there must be associated emotional distress. *Id.* at 436. *Bacharach* never states that FCRA plaintiffs suffer "*per se*" actual damages upon disclosure of inaccurate credit information. Such a rule would eviscerate the longstanding understanding that

FCRA "liability does not flow automatically from the fact that a [CRA] ... reports inaccurate information." *Bryant v. TRW, Inc.*, 689 F.2d 72, 78 (6th Cir. 1982).

2. Ramirez Najera also identifies (at 32-33), as a purportedly independent category of damages, the time he spent before July 2024 "researching how best to dispute" the Rushmore account and "locating and assembling documents." But he cites no case holding that lost time is an independent category of "actual damages" apart from emotional distress it might cause. He cites (at 17) *Pedro v. Equifax, Inc.*, 868 F.3d 1275, 1280 (11th Cir. 2017), but that case only held that allegations of lost time were sufficient to establish Article III standing, not actual damages. The only case even appearing to permit recovery related to lost time is S*tevenson v. TRW Inc.*, 987 F.2d 288, 297 (5th Cir. 1993). Yet that case more precisely upheld an emotional-distress damages award, reasoning that time the plaintiff spent disputing credit-report inaccuracies supported his claim of mental anguish. *Id.* at 297. It does not stand for the proposition that lost time independently constitutes actual damages, absent proven emotional distress.

3. Ramirez Najera claims (at 33-35) that the district court erred in determining that no reasonable jury could conclude he suffered economic damages. He claims economic damages based on a purported "complication[]" with a mortgage application in 2025, pointing to his mortgage originator's declaration. The argument fails for two reasons.

First, Ramirez Najera never raised it below. While he tried relying on the mortgage originator's declaration to corroborate his claimed emotional distress, *supra*, p. 22, he never argued he could recover damages because the Rushmore account made his mortgage process more "complicated." *See* ROA.1541-1544, Plaintiff's MSJ Brief; ROA.4075-4081, Plaintiff's Opposition to Experian's MSJ. He cannot do so now for the first time on appeal. *Quest Med., Inc. v. Apprill*, 90 F.3d 1080, 1088 & n.10 (5th Cir. 1996) (collecting cases).

Second, and in any event, Ramirez Najera offers no support for the proposition that actual damages under FCRA are available just because a mortgage application might require manual underwriting. Citing *Smith v. Santander Consumer USA, Inc.*, 703 F.3d 316 (5th Cir. 2012), and *Cameron*, 713 F. App'x at 239, he argues (at 34) he only needed to proffer "evidence from which a reasonable jury could find the inaccurate reporting affected a credit decision." But *Smith* requires an actual increase in cost or refusal of credit. 703 F.3d at 317-18. The declaration from Ramirez Najera's mortgage originator is not evidence of either. It states only that the mixed file "may" have required manual underwriting in place of automated approval—not that Ramirez Najera's mortgage was actually delayed, that he paid a higher rate, or that his application was denied. *Supra*, pp. 22-23.

*Cameron* does not help him either. *Cameron* affirmed summary judgment *against* a plaintiff who, like Ramirez Najera, had evidence of a credit application in

progress but no evidence of a denial, let alone one caused by the alleged FCRA violation. 713 F. App'x at 240-41.

## II. THE DISTRICT COURT CORRECTLY HELD THAT RAMIREZ NAJERA'S CHALLENGE TO EXPERIAN'S MATCHING PROCEDURES UNDER § 1681E(B) FAILS AS A MATTER OF LAW.

The Court should affirm summary judgment for Experian on Ramirez Najera's first theory of liability, which challenged the reasonableness of Experian's matching procedures under § 1681e(b). As a matter of law, it was not unreasonable for Experian to link Ramirez Najera's father's accounts to Ramirez Najera, given all the similarities between the two men.

### A. Experian's reporting procedures are reasonable as a matter of law.

Credit reports sometimes contain inaccuracies, including those stemming from mixed files, and § 1681e(b) does not impose strict liability for them. *Hammer*, 974 F.3d at 568. The presence of an inaccuracy is, standing alone, not evidence that a CRA's reporting procedures were unreasonable. *Sepulvado*, 158 F.3d at 896. Reasonableness is judged against what a reasonably prudent person would do under the circumstances, *Thompson*, 682 F.2d at 513, and may be resolved on summary judgment where "the reasonableness or unreasonableness of the procedures is beyond question," *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001); *see Barron*, 802 F. App'x at 163 (affirming summary judgment on reasonableness grounds).

In judging the reasonableness of a CRA's matching procedures, courts consider the sheer volume of consumer information CRAs must sort, compare, and match on a continuous basis. *Sarver v. Experian Info. Sols.*, 390 F.3d 969, 972 (7th Cir. 2004) (recognizing that, "given ... the volume of information involved, a mistake does not render the procedures unreasonable"); *accord Rydholm v. Equifax Info. Servs. LLC*, 44 F.4th 1105, 1109 (8th Cir. 2022).

The undisputed factual record here leaves reasonableness beyond genuine dispute. Experian's algorithm compares numerous pieces of data against identifying information reported about a consumer over time, including prior names and variations, and analyzes this data for both similarities and conflicts before a report is assembled. *Supra*, pp. 7-8. While matching sometimes may occur without a complete SSN or date of birth match, this flexibility is necessary, not incidental, to § 1681e(b)'s accuracy obligations. Experian's matching procedures must "accommodate and allow for changes and variations in items of information" over a consumer's lifetime—marriage-related name changes, address changes, and furnisher data-entry errors—because a rigid system would fragment millions of consumers' credit histories across incomplete files and thereby decrease the accuracy of Experian's reporting. ROA.1180(¶13); *supra*, pp. 7-8.

Regulators have recognized this issue's complexity, and the fact that rigid requirements for matching result in their own form of inaccuracy: incompleteness.

For example, Congress has noted that a system processing "almost two billion pieces of data per month" "will never be perfectly accurate" and that "not all" mistakes "can be prevented." S. Rep. No. 104-185, at 43 (1995). The Federal Trade Commission, after formally studying mixed-file risk, concluded that CRAs face an unavoidable tradeoff between accuracy and completeness: "If the CRA adopts a 'stricter' matching algorithm that reduces inaccuracy, the necessary result is that incompleteness will increase." ROA.3633, FTC Report. And the New York Attorney General reached the same conclusion after an extensive investigation into Experian's procedures, observing that matching flexibility "can benefit consumers by ensuring that positive credit information is not omitted from a consumer's file based on minor omissions or errors." ROA.1449-1450(¶7), NYAG Settlement.

Against this backdrop, the district court correctly held that the misattribution of Victor Manuel Ramirez's mortgage accounts to his son, Victor Manuel Ramirez Najera, was not unreasonable as a matter of law. Father and son have names that are almost identical, that have been identical on credit applications, and they used the same address; what's more, Ramirez Najera's father lacked an SSN to serve as a differentiator between the two. *Supra*, p. 10. Courts confronting analogous overlaps in shared identifying information have found matching procedures similar to Experian's reasonable as a matter of law, even where they resulted in mixed files. *Garrett v. Experian Info. Sols., Inc.*, 785 F. Supp. 3d 1077, 1082 (N.D. Fla. 2025)

(concluding "as a matter of law that a policy is not unreasonable simply because it allows records to be associated with an individual's credit file with one SSN digit off, particularly when there are other matching indicators"). At bottom, "the statutory duty to maintain reasonable procedures to avoid inaccuracy does not require a [CRA] to disregard the possibility that similar files refer to the same person." *Crabill*, 259 F.3d at 663.

**B. Ramirez Najera's arguments lack merit.**

Ramirez Najera's arguments challenging the district court's ruling on his § 1681e(b) claim all fail.

1. He argues (at 42-44) that the district court erred by (supposedly) relying on a declaration from Experian's Director of Litigation Support, Kimberly Cave. In that declaration, Cave explained the innerworkings of Experian's matching procedure. ROA.6506, Cave Decl. According to Ramirez Najera, the district court should not have (supposedly) relied on that declaration because it was initially filed in another case and it contradicted Experian's Rule 30(b)(6) testimony in this case.

This is a *non sequitur*, because the district court did not actually rely on the challenged declaration. In Experian's opening brief in support of its own summary judgment motion, it cited a declaration from Cave initially filed *in this case* explaining the need for flexible matching. *E.g.*, ROA.1135, Experian's MSJ Brief (citing ROA.1177, Cave Decl.). Ramirez Najera never challenged *that* declaration.

ROA.4032-4081, Plaintiff's MSJ Opposition. Rather, he objected to a *different* declaration from Cave, filed with Experian's opposition to Ramirez Najera's competing summary judgment motion. ROA.6506, Plaintiff's MSJ Reply; ROA.6457, Experian's MSJ Opposition (citing ROA.6496, Cave Decl.). When the district court discussed Experian's need for flexible matching procedures, however, it cited Experian's opening summary judgment brief and not its responsive brief. ROA.7277, Opinion. Ramirez Najera thus never challenged the Cave declaration on which the district court actually relied.

In any event, Ramirez Najera's suggestion that Experian's Rule 30(b)(6) witness somehow denied the importance of flexible matching is meritless. Experian's Rule 30(b)(6) witness never disagreed with Cave that Experian needs flexible matching procedures. Ramirez Najera's challenge to Cave's declaration concerned only an immaterial detail about *how* Experian matches data to consumers. ROA.6507-6508, Plaintiff's MSJ Reply.

2. Ramirez Najera argues at length (at 44-53) that it is unreasonable for CRAs to match an account "with a consumer file based on nothing more than a matching name and address"—that more information must be required. In effect, his argument is that a CRA cannot assign a credit account for "Englebert Humperdinck, Apartment 7G, 12345 Main Street, Tinytown, TX," to someone with that same name at that address, unless a matching SSN and date of birth also are

provided.

Ramirez Najera's argument is wrong as a matter of law. As numerous federal and state legislators and regulators have recognized, credit reporting involves balancing two competing interests: not only accuracy, but also completeness. *See supra*, pp. 7-8. Consumers benefit when a credit report is based on their complete credit history, where that history demonstrates regular payment on a variety of accounts. ROA.3582, FTC Report. An incomplete credit report, mistakenly excluding favorable credit accounts actually belonging to the consumer, can negatively impact credit ratings just as the mistaken inclusion of a negative account might. *Id.*; *accord* ROA.3623. Unfortunately, SSNs and dates of birth might be missing from information furnishers provide, or might be mistyped. ROA.3626; ROA.887-888, Methvin Report. A strict matching algorithm that only links accounts to consumers when matching SSNs and dates of birth are provided will inevitably result in credit files that are mistakenly *under*-inclusive. ROA.3583, FTC Report. A more flexible algorithm avoids that problem. And, to the extent a more flexible algorithm sometimes results in mixed files, the dispute process exists for corrections to be made. ROA.894, Methvin Report.

Unsurprisingly, therefore, courts have rejected Ramirez Najera's precise argument. For example, in *McClelland v. Experian Info. Sols., Inc.*, 2006 WL 2191973, at *3 (N.D. Ill. July 28, 2006), the court held that a policy allowing

matching between father and son with "the same first and last name and the same address" was not unreasonable as a matter of law. As the court explained, those types of mistakes do "not render the procedures unreasonable," "given the complexity of [Experian's matching] system and the volume of information involved." *Id.* (citation modified).

Also on point is *Garrett*, where the plaintiff argued that the CRA's mixing of his file with his twin brother's stemmed from unreasonable matching procedures. 785 F. Supp. 3d at 1082. The court disagreed, in part because the brothers' information was very similar—including nearly identical names and the same address. *Id.* The court concluded "as a matter of law that a [matching] policy is not unreasonable simply because it allows records to be associated with an individual's credit file with one SSN digit off, particularly when there are other matching indicators"—like name and address. *Id.* Other courts likewise have held that policies allowing matching based on name and address are not unreasonable simply because they may allow, in some cases, for mixed files. *E.g.*, *Fraase v. Advantage Credit Bureau*, 179 F.4th 654, 658 (8th Cir. 2026) (rejecting argument that CRA should have "written procedures for twins or similar names").

The two district court cases on which Ramirez Najera relies (at 51-52) to argue that matching based on name and address alone is unreasonable do not support him. In *Fahey v. Experian Info. Sols., Inc.*, 571 F. Supp. 2d 1082, 1084 (E.D. Mo. 2008),

there was no question of mistaken identity; the plaintiff's argument instead was that he never agreed to co-sign his ex-wife's credit card accounts. The court in that case thought it potentially unreasonable for the CRA to assume he had co-signed when the credit-card company did not have his SSN or signature. *Id*. at 1091. But Ramirez Najera cannot make that argument here, since his father apparently obtained a mortgage without an SSN. As for *Apodaca v. Discover Fin. Servs.*, 417 F. Supp. 2d 1220, 1224 (D.N.M. 2006), that case did not involve the same name and complete address, but only the same name, state of residence, and a partially matching SSN.[1] The court acknowledged the competing risks of over- and under-inclusive credit reporting, and remarked "there is nothing illegal *per se* about using partial matching logic." *Id*. at 1230. The court did *not* fault the CRA for initially matching a credit account to plaintiff, but for not doing more *after* plaintiff raised a dispute. *Id*. at 1230-31. *Apodaca* thus *undermines* Ramirez Najera's § 1681e(b) claim based on the initial misattribution of his father's mortgage accounts.

Ramirez Najera cites (at 46, emphasis in original) a recent jury verdict in another case, asserting that the jury there found Experian liable for confusing a father and son "based on a match of only **first** name and address without any matching SSN or DOB." Of course, here, Experian did not rely only on a "first" name, but on

[1] Ramirez Najera's assertion (at 52) that same name, state of residence, and partial SSN is "far stricter" than same name and address is sheer ipse dixit and scarcely self-evident.

a first name, middle name, and initial last name. Ramirez Najera also provides no other information about that other case—for example, whether father and son both had SSNs, whether their last names differed, and so on. And that verdict may well be overturned as a result of the currently pending post-trial motions or on the already noticed appeal. *Garcia Delgado v. Experian Info. Sols., Inc.*, No. 4:24-cv-00637, Dkt Nos. 233, 237 (E.D. Tex.).

3. Ramirez Najera relies (at 46-47) on consent orders entered in 1991 between an Experian predecessor named TRW, and the FTC and state Attorneys General, and argues they "show Experian has long known that such minimal matching requirements create a heightened risk of excessive inaccuracy." That is a wholly inaccurate description. As relevant here, the orders only required TRW to modify its software "to enable such system to accommodate and use, for matching and identification purposes, a Consumer's Full Identifying Information," and to inform furnishers and those requesting credit reports that they should "attempt to (i) obtain Full Identifying Information from Consumers and (ii) use Full Identifying Information when reporting Credit Information to TRW and when requesting Consumer Reports from TRW." *F.T.C. v. TRW Inc.*, 784 F. Supp. 361, 362-63 (N.D. Tex. 1991). Those orders say nothing about the reasonableness of a CRA matching based on name and address, where an SSN and date of birth are *not* available.

Ramirez Najera similarly relies (at 47) on two more recent settlements between CRAs and federal regulators, arguing they show "the entire consumer reporting industry has been repeatedly put on notice that the kind of matching procedures used here can violate the FCRA." The words "kind" and "can" are carrying far more weight than they can possibly bear. As for the first settlement, that concerned "matching criminal records ... based solely on a matching first and last name and matching address." *CFPB v. Sterling Infosystems, Inc.*, No. 1:19-cv-10824-AJN, Dkt No. 1 ¶ 11; Dkt. No. 11 (S.D.N.Y.). That mere allegation about *criminal* records says nothing about what is reasonable for matching *financial* information. As for the second settlement, also involving criminal information, the allegation there was that the defendant allowed matching based on "last name only"—which is of course not the allegation here. *F.T.C. v. RealPage, Inc.*, Case No. 3:18-cv-02737-N, Dkt No. 1 ¶ 18 (N.D. Tex.).

4. Ramirez Najera's remaining points about his § 1681e(b) claim have no more merit. For example, he argues (at 48) that when it comes to Hispanic consumers, the Consumer Financial Protection Bureau "has specifically warned about name-only matching procedures." But the advisory opinion he cites explains "[n]ame-only matching occurs when a consumer reporting agency uses only first and last name to determine whether a particular item of information relates to a particular consumer, without using other personally identifying information such as *address*,

date of birth, *or* Social Security number." Fair Credit Reporting; Name-Only Matching Procedures, 86 Fed. Reg. 62,468 (Nov. 10, 2021) (emphases added). The disjunctive "or" shows that the CFPB was *not* stating that name and address are together insufficient, and that SSNs and dates of birth also are necessary. And here, Ramirez Najera does not claim that he was matched to his father's mortgage accounts based on name alone.

Ramirez Najera asserts (at 48-49) that the other national CRAs did not link his father's mortgage accounts to his file, and argues that "[c]ourts routinely hold that the absence of the same inaccuracy in the reporting from other CRAs supports an inference that a defendant CRA's procedures were unreasonable." As an initial matter, his factual cites for this argument only show (at most) that those other CRAs did not match his father's accounts to him in April 2025, not that they *never* did.[2] Even assuming they never did, considering the volume of FCRA litigation across the country, the two district court cases he cites (one of which concerns a motion to dismiss, not for summary judgment) do not remotely support his sweeping claim. The question under § 1681e(b) is whether the CRA employs "reasonable procedures"—the statute is focused on *process*, not *outcomes*. Allowing a jury to

[2] ROA.1590:9-25, Plaintiff's Depo. (lacking any mention of other CRAs); ROA.3409-3410(¶6), Plaintiff's Decl. (noting the Rushmore account "did not appear in either the Equifax or Trans Union credit reports ... in April 2025"); ROA.6421(¶6), Jones Decl. (similar).

find that one CRA's *process* must have been unreasonable simply because another CRA reached a different *outcome*—rather than based on a consideration of the defendant CRA's own procedures—ignores the statutory standard. It also improperly assumes that if Experian mistakenly included a credit account the other CRAs did not then Experian's process must be unreasonable, when Experian must be alert to the risk of under-inclusive credit reports too. And in that regard, Ramirez Najera's argument is silent as to the actual matching processes those other CRAs employ—whether or how they even differ from Experian's. For all we know, their matching criteria may be unreasonably strict.

### C. Ramirez Najera's contentions concerning Experian's post-dispute reporting procedures fail as a matter of law.

Ramirez Najera separately argues (at 36-41) that the district court erred by failing to evaluate Experian's "post-dispute" reporting as an independent § 1681e(b) violation. In short, he claims Experian not only violated § 1681i by conducting inadequate reinvestigations, but also violated § 1681e(b) by continuing to distribute credit reports showing his father's Rushmore account following those reinvestigations.

This § 1681e(b) argument has something of an angels-on-pinheads flavor to it, since it turns on the very same issue already before the Court under § 1681i: whether Experian's response, once Ramirez Najera disputed the accuracy of his credit report, was "reasonable." *Compare* § 1681e(b) ("Whenever a consumer

reporting agency prepares a consumer report it shall follow reasonable procedures"), *with* § 1681i ("the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate"). Ramirez Najera does not cite a single case holding that a CRA's reinvestigation of a disputed account might have been reasonable for purposes of § 1681i, but the CRA's continued reporting of that account after the reinvestigation was not reasonable for purposes of § 1681e(b).

FCRA's structure is clear and forecloses Ramirez Najera's approach as a matter of law. Under FCRA, § 1681e(b) covers the initial match between a consumer and a credit account in a credit report, and § 1681i governs reinvestigations in response to a dispute. Holding a CRA responsible under § 1681e(b) for continuing to associate a credit account with a consumer after conducting a reinvestigation would result in unnecessarily duplicative statutory coverage and render § 1681i effectively redundant. Bedrock principles of statutory construction counsel against such an interpretation. *Exelon Wind 1, L.L.C. v. Nelson*, 766 F.3d 380, 399 (5th Cir. 2014) ("[O]ne of the most basic interpretive canons [is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void, or insignificant." (quoting *Corley v. United States*, 556 U.S. 303, 314 (2009)).

Even if § 1681e(b) could apply to continued reporting following a reinvestigation, for reasons given elsewhere, Ramirez Najera has not shown that Experian's response to his first dispute was unreasonable, and so its continued reporting of his father's mortgage after the first dispute should not violate either § 1681i or § 1681e(b). Likewise, Ramirez Najera's failure to tie any corroborated actual damages to Experian's response to his second dispute would apply as much to a claim under § 1681e(b) as a claim under § 1681i.

Ramirez Najera tries a "gotcha" argument, asserting (at 38-41) he is entitled to summary judgment on this § 1681e(b) theory because Experian never addressed it below: "Experian has **never** offered any evidence of its post-dispute reporting procedures, much less offered evidence showing how or why such procedures were reasonable." That is obviously not correct. A CRA's "reinvestigation" procedures within the meaning of § 1681i are inseparable from its "post-dispute reporting procedures," since the results of the reinvestigation inherently will inform any "post-dispute reporting." Experian both (1) defended the reasonableness of its reinvestigation procedures, and (2) raised Ramirez Najera's failure to prove actual damages. As Ramirez Najera acknowledges (at 39), Experian also (3) disputed the applicability of § 1681e(b) to post-dispute reporting as a matter of law. *See* ROA.6463 n.14, Experian's MSJ Opposition. Experian certainly did not concede

this issue below, nor did the district court commit error by failing to grant Ramirez Najera summary judgment with respect to "post-dispute reporting procedures."

## III. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT TO EXPERIAN ON RAMIREZ NAJERA'S REINVESTIGATION CLAIMS UNDER § 1681i.

Ramirez Najera argues (at 55-59) Experian did not reasonably reinvestigate his first dispute. He further claims (at 55) summary judgment should enter for him with respect to his second dispute. Both contentions fail.

### A. Experian reasonably reinvestigated Ramirez Najera's first dispute.

A claim under § 1681i requires showing that a reinvestigation was unreasonable. *Reyes*, 140 F.4th at 286. While there is no one-size-fits-all approach to reasonableness, this Court and others repeatedly have held that a CRA's use of ACDVs is generally acceptable. *Barron*, 802 F. App'x at 162; *see also Morris v. Trans Union LLC*, 420 F. Supp. 2d 733, 754 (S.D. Tex. 2006) ("The FCRA imposes no specific duty on a consumer reporting agency to conduct its own reinvestigation apart from contacting the furnisher of the disputed information."), *aff'd*, 224 F. App'x 415 (5th Cir. 2007); *Lloyd v. FedLoan Servicing*, 105 F.4th 1020, 1025 (8th Cir. 2024) (concluding use of ACDVs was reasonable); *Bagby v. Experian Info. Sols., Inc.*, 162 F. App'x 600, 607 (7th Cir. 2006) (determining CRA had "no duty to investigate beyond the CDV inquiry and that its actions complied with requirements of § 1681i(a)").

Consistent with that precedent, the district court held that Experian's reliance on ACDVs to reinvestigate Ramirez Najera's first dispute was reasonable. As the court noted, "Ramirez gave no information to put Experian on notice that an investigation beyond an ACDV was necessary." ROA.7283, Opinion.

In response, Ramirez Najera argues (at 55-56) that federal courts have *rejected* reliance on ACDVs—that "[f]ederal courts have long held that, for furnishers and CRAs alike, responding to a well-founded dispute with nothing more than a data conformity review is the quintessential 'unreasonable investigation.'" That is not correct when it comes to CRAs. Every case he cites concerns a *furnisher's* distinct reporting duty under 15 U.S.C. § 1681s-2(b)—not a CRA's reinvestigation duty under § 1681i(a). *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1302 (11th Cir. 2016); *Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 617 (6th Cir. 2012); *Daugherty v. Ocwen Loan Servicing, LLC*, 701 F. App'x 246, 252 (4th Cir. 2017).

Ramirez Najera argues (at 56) that CRAs must "conduct their own independent inquiry when they have some reason to doubt the accuracy of a furnisher's reporting." The district court did not say anything different: instead, it ruled that "Ramirez gave no information to put Experian on notice that an investigation beyond an ACDV was necessary." ROA.7283, Opinion. Challenging that factual ruling, Ramirez Najera argues (at 56-57, emphasis in original) that he "**did** give Experian reason," because he "informed Experian that the Rushmore and

PennyMac Accounts were mortgage accounts that did not belong to him." In fact, all he said was "Um. It's not mine." *Supra*, p. 11. That barebones statement cannot be enough to require CRAs to go beyond ACDVs; otherwise, *every* dispute involving an allegedly mismatched account would foreclose reliance on ACDVs. Ramirez Najera does not cite *any* precedent for that sweeping proposition, and at least one court has rejected it. *See McClelland*, 2006 WL 2191973, at *4. He also emphasizes (at 57) various circumstances, like his age at loan origination and the alleged connection between the Rushmore and PennyMac accounts, that show the loan cannot have been his. But that only matters if he directed Experian to that information. As to the first dispute, he did not, and so Experian was entitled to rely on the ACDV process.

Ramirez Najera further argues (at 58) that Experian's response to the first dispute was unreasonable because the dispute agent "never asked Plaintiff any follow-up questions," as agents are trained to do. But even if Experian considers asking follow-up questions to be best practice, Ramirez Najera cites no case holding that a dispute agent acts unreasonably, subjecting her employer to FCRA liability, if she does not ask follow up questions before sending an ACDV.

### B. Ramirez Najera is not entitled to summary judgment with respect to the second dispute.

Turning to the second dispute, Ramirez Najera asks that summary judgment be entered in his favor, asserting (at 55) "[t]he district court has already held that

Experian's reinvestigation … was unreasonable." But as the district court held, and for the reasons given above, Ramirez Najera cannot show any actual damages caused by Experian's resolution of the second dispute, or that Experian's alleged violation was willful. *See supra*, pp. 24-33. Summary judgment for Experian on the second dispute was proper for these independent reasons, and judgment certainly should not enter for Ramirez Najera.

## IV. THE DISTRICT COURT CORRECTLY HELD THAT RAMIREZ NAJERA COULD NOT SHOW ANY VIOLATION WAS WILLFUL.

Ramirez Najera finally argues (at 59-69) that the district court erred in granting summary judgment to Experian on his claim of willful FCRA violations. First, he complains that the district court analyzed only whether the alleged FCRA violations were "knowing," without also addressing whether they were "reckless." He then argues he had sufficient evidence of recklessness to get past summary judgment. Both arguments fail.

### A. The district court applied the correct standard.

*Safeco* held that "willfully" under § 1681n(a) encompasses recklessness—that is, conduct carrying "an unjustifiably high risk of harm that is either known or so obvious that it should be known." 551 U.S. at 71, 68 (citation modified). The Court was explicit that recklessness demands more than carelessness: a defendant does not act in reckless disregard of FCRA "unless the action is not only a violation under a reasonable reading of the statute's terms, but shows that the company ran a risk of

violating the law substantially greater than the risk associated with a reading that was merely careless." *Id.* at 69.

Ramirez Najera claims the district court failed to address recklessness, but that is incorrect. Indeed, he admits the district court recited *Safeco*'s recklessness standard in full, including the "substantially greater" risk requirement. ROA.7274, Opinion. And the district court's decision addressed considerations that *Safeco* identifies as relevant to recklessness. For example, the court observed that "[t]he Fifth Circuit has not held that failing to require [an SSN] ... amounts to be a willful violation" (ROA.7275)—an analysis sounding in *Safeco*'s recklessness consideration that "no court of appeals had spoken on the issue" (551 U.S. at 70). The district court also rejected Ramirez Najera's historical-notice theory of recklessness, based on consent decrees and cases concerning Experian's predecessor in the early 1990s, because Experian had updated its procedures in 2008 and 2018. ROA.7275 That reasoning addresses whether the risk identified by that purported "notice" went unaddressed. *See Safeco*, 551 U.S. at 70.

### B. There is no evidence Experian's matching procedures willfully violate § 1681e(b).

Ramirez Najera claims (at 67-69) that a reasonable jury could conclude that Experian willfully violated § 1681e(b). As with his negligence contentions, he points to the 1991 consent orders, CFPB guidance that Hispanic naming conventions

can complicate matching, and the fact that other CRAs did not report the Rushmore account in 2025.

Since that evidence cannot establish negligence for the reasons explained above, it necessarily cannot satisfy the higher recklessness standard. *See supra*, pp. 33-47. To reiterate, the 1991 consent orders do not address CRAs matching based on name and address when an SSN and date of birth are not also available. *Supra*, p. 41. They therefore could not have put Experian on notice that such a matching procedure is "objectively unreasonable." *Safeco*, 551 U.S. at 70. The same is true as to Ramirez Najera's Hispanic-naming-convention argument, since the CFPB guidance he cites does not say that matching based on name *and* address is objectively unreasonable. *Supra*, pp. 42-43. And Ramirez Najera's evidence that two other CRAs did not link his father's mortgage accounts to his file does not show that Experian must have acted unreasonably in doing so. *Supra*, p. 43. The district court therefore properly granted summary judgment to Experian on recklessness with respect to Ramirez Najera's § 1681e(b) claim.

### C. There is no evidence Experian's reinvestigations willfully violated § 1681i(a).

Ramirez Najera claims recklessness in Experian's reinvestigations, pointing (at 63-67) to claimed procedural lapses in the first dispute, the dispute agent's mistaken decision to send another ACDV in processing the second dispute, and

Experian's alleged dispute-processing quotas and quality-review standards. His arguments do not establish reckless violations of § 1681i(a).

As for the first dispute, Ramirez Najera again points (at 64) to the supposedly missed follow-up questions, and a purported failure to escalate upon receiving inconsistent identification information in PennyMac's ACDV response. But the district court correctly held that Experian's first reinvestigation was reasonable as a matter of law, *supra*, pp. 47-49, which necessarily precludes a willfulness determination. The alleged mistakes amount to at most isolated "failure[s] to adequately investigate," which "generally do[] not constitute a willful violation." *Cameron*, 713 F. App'x 240.

With respect to the second dispute, Ramirez Najera again relies (at 63) on Experian's acknowledgement that the dispute agent should not have sent a second ACDV, but should have elevated the file. Even if that is enough to show that Experian's reinvestigation was not reasonable, it does not support a finding of recklessness. As the district court explained, the agent who processed the second dispute acknowledged that his decision to send another ACDV was a mistake inconsistent with his training and Experian's procedures. ROA.1285(¶8), Avalos Decl.; ROA.7285. That is the sort of human error that does not rise to the level of willfulness. *See Cameron*, 713 F. App'x at 240.

Ramirez Najera finally posits (at 65-66) that Experian's purported dispute-processing and quality-control statistics evidence a system likely to produce mistakes. But his authority does not support that argument. Citing *Marchisio v. Carrington Mortg. Servs., LLC*, 919 F.3d 1288, 1301-02 (11th Cir. 2019), he says "[c]ourts have rejected attempts to label repeated reporting failures 'isolated human error' where the evidence permits the inference that the defendant's system predictably produced the errors." Yet that case concerned a *furnisher's* more robust reinvestigation duties. *Id.* at 1302-03. The other two cases Ramirez Najera cites are equally inapposite, involving a bungled attempt to unmix a file that the CRA determined had been mixed and a "suspicious mail" policy, with no mention of the defendant's dispute-processing cadence or quality-control procedures. *See Reeves v. Equifax Info. Servs., LLC*, 2010 WL 2036661, at *12 (S.D. Miss. May 20, 2010); *Ricketson v. Experian Info. Sols., Inc.*, 266 F. Supp. 3d 1083, 1096 (W.D. Mich. 2017).

The inference that Ramirez Najera seeks also is unsupported by any evidence. He points (at 65) to testimony from the dispute agent handling the second dispute, which he claims indicates that dispute agents are expected to handle fifteen disputes per hour. But he cites no evidence, expert or otherwise, to show that this pace of dispute processing amounts to recklessness; he instead invites only speculation. Ramirez Najera also cites testimony concerning the number of disputes audited for

quality-control purposes, but this argument suffers from the same problem: he lacks any evidence to show that this cadence of quality-control review amounts to recklessness. Without such evidence, Ramirez Najera cannot show that Experian acted willfully. The district court properly granted summary judgment to Experian.

## CONCLUSION

For the foregoing reasons, the Court should affirm the grant of summary judgment for Experian.

Date: September 21, 2026

Respectfully submitted,


*<u>/s/ Kevin P. Martin</u>*
Kevin P. Martin
Christopher J. C. Herbert
**GOODWIN PROCTER LLP**
100 Northern Avenue
Boston, MA 02210
(617) 570-1000
kmartin@goodwinlaw.com
cherbert@goodwinlaw.com

Allison B. Allman
**JACKSON WALKER, L.L.P.**
777 Main Street, Suite 2100
Fort Worth, TX 76102
(817) 334-7206
aallman@jw.com

*Counsel for Defendant-Appellee Experian Information Solutions, Inc.*

# ADDENDUM

## ADDENDUM TABLE OF CONTENTS

**Page**

15 U.S.C. § 1681e....................................................................................Add.1

15 U.S.C. § 1681i.....................................................................................Add.4

15 U.S.C. § 1681n..................................................................................Add.14

15 U.S.C. § 1681*o*..................................................................................Add.16

15 U.S.C. § 1681e

§ 1681e. Compliance procedures

**(a) Identity and purposes of credit users**

Every consumer reporting agency shall maintain reasonable procedures designed to avoid violations of section 1681c of this title and to limit the furnishing of consumer reports to the purposes listed under section 1681b of this title. These procedures shall require that prospective users of the information identify themselves, certify the purposes for which the information is sought, and certify that the information will be used for no other purpose. Every consumer reporting agency shall make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report. No consumer reporting agency may furnish a consumer report to any person if it has reasonable grounds for believing that the consumer report will not be used for a purpose listed in section 1681b of this title.

**(b) Accuracy of report**

Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates.

**(c) Disclosure of consumer reports by users allowed**

A consumer reporting agency may not prohibit a user of a consumer report furnished by the agency on a consumer from disclosing the contents of the report to the consumer, if adverse action against the consumer has been taken by the user based in whole or in part on the report.

**(d) Notice to users and furnishers of information**

**(1) Notice requirement**

A consumer reporting agency shall provide to any person—

**(A)** who regularly and in the ordinary course of business furnishes information to the agency with respect to any consumer; or
**(B)** to whom a consumer report is provided by the agency;

a notice of such person's responsibilities under this subchapter.

**(2) Content of notice**

The Bureau shall prescribe the content of notices under paragraph (1), and a consumer reporting agency shall be in compliance with this subsection if it provides a notice under paragraph (1) that is substantially similar to the Bureau prescription under this paragraph.

**(e) Procurement of consumer report for resale**

**(1) Disclosure**

A person may not procure a consumer report for purposes of reselling the report (or any information in the report) unless the person discloses to the consumer reporting agency that originally furnishes the report—

**(A)** the identity of the end-user of the report (or information); and

**(B)** each permissible purpose under section 1681b of this title for which the report is furnished to the end-user of the report (or information).

**(2) Responsibilities of procurers for resale**

A person who procures a consumer report for purposes of reselling the report (or any information in the report) shall—

**(A)** establish and comply with reasonable procedures designed to ensure that the report (or information) is resold by the person only for a purpose for which the report may be furnished under section 1681b of this title, including by requiring that each person to which the report (or information) is resold and that resells or provides the report (or information) to any other person—

**(i)** identifies each end user of the resold report (or information);

**(ii)** certifies each purpose for which the report (or information) will be used; and

**(iii)** certifies that the report (or information) will be used for no other purpose; and

**(B)** before reselling the report, make reasonable efforts to verify the identifications and certifications made under subparagraph (A).

**(3) Resale of consumer report to a Federal agency or department**

Notwithstanding paragraph (1) or (2), a person who procures a consumer report for purposes of reselling the report (or any information in the report) shall not disclose the identity of the end-user of the report under paragraph (1) or (2) if—

**(A)** the end user is an agency or department of the United States Government which procures the report from the person for purposes of determining the eligibility of the consumer concerned to receive access or continued access to classified information (as defined in section 1681b(b)(4)(E)(i) of this title); and

**(B)** the agency or department certifies in writing to the person reselling the report that nondisclosure is necessary to protect classified information or the safety of persons employed by or contracting with, or undergoing investigation for work or contracting with the agency or department.

15 U.S.C. § 1681i

§ 1681i. Procedure in case of disputed accuracy

**(a) Reinvestigations of disputed information**

**(1) Reinvestigation required**

**(A) In general**

Subject to subsection (f) and except as provided in subsection (g), if the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly, or indirectly through a reseller, of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file in accordance with paragraph (5), before the end of the 30-day period beginning on the date on which the agency receives the notice of the dispute from the consumer or reseller.

**(B) Extension of period to reinvestigate**

Except as provided in subparagraph (C), the 30-day period described in subparagraph (A) may be extended for not more than 15 additional days if the consumer reporting agency receives information from the consumer during that 30-day period that is relevant to the reinvestigation.

**(C) Limitations on extension of period to reinvestigate**

Subparagraph (B) shall not apply to any reinvestigation in which, during the 30-day period described in subparagraph (A), the information that is the subject of the reinvestigation is found to be inaccurate or incomplete or the consumer reporting agency determines that the information cannot be verified.

**(2) Prompt notice of dispute to furnisher of information**

**(A) In general**

Before the expiration of the 5-business-day period beginning on the date on which a consumer reporting agency receives notice of a dispute from any

consumer or a reseller in accordance with paragraph (1), the agency shall provide notification of the dispute to any person who provided any item of information in dispute, at the address and in the manner established with the person. The notice shall include all relevant information regarding the dispute that the agency has received from the consumer or reseller.

**(B) Provision of other information**

The consumer reporting agency shall promptly provide to the person who provided the information in dispute all relevant information regarding the dispute that is received by the agency from the consumer or the reseller after the period referred to in subparagraph (A) and before the end of the period referred to in paragraph (1)(A).

**(3) Determination that dispute is frivolous or irrelevant**

**(A) In general**

Notwithstanding paragraph (1), a consumer reporting agency may terminate a reinvestigation of information disputed by a consumer under that paragraph if the agency reasonably determines that the dispute by the consumer is frivolous or irrelevant, including by reason of a failure by a consumer to provide sufficient information to investigate the disputed information.

**(B) Notice of determination**

Upon making any determination in accordance with subparagraph (A) that a dispute is frivolous or irrelevant, a consumer reporting agency shall notify the consumer of such determination not later than 5 business days after making such determination, by mail or, if authorized by the consumer for that purpose, by any other means available to the agency.

**(C) Contents of notice**

A notice under subparagraph (B) shall include—

**(i)** the reasons for the determination under subparagraph (A); and
**(ii)** identification of any information required to investigate the disputed information, which may consist of a standardized form describing the general nature of such information.

**(4) Consideration of consumer information**

In conducting any reinvestigation under paragraph (1) with respect to disputed information in the file of any consumer, the consumer reporting agency shall review and consider all relevant information submitted by the consumer in the period described in paragraph (1)(A) with respect to such disputed information.

**(5) Treatment of inaccurate or unverifiable information**

**(A) In general**

If, after any reinvestigation under paragraph (1) of any information disputed by a consumer, an item of the information is found to be inaccurate or incomplete or cannot be verified, the consumer reporting agency shall—

**(i)** promptly delete that item of information from the file of the consumer, or modify that item of information, as appropriate, based on the results of the reinvestigation; and

**(ii)** promptly notify the furnisher of that information that the information has been modified or deleted from the file of the consumer.

**(B) Requirements relating to reinsertion of previously deleted material**

**(i) Certification of accuracy of information**

If any information is deleted from a consumer's file pursuant to subparagraph (A), the information may not be reinserted in the file by the consumer reporting agency unless the person who furnishes the information certifies that the information is complete and accurate.

**(ii) Notice to consumer**

If any information that has been deleted from a consumer's file pursuant to subparagraph (A) is reinserted in the file, the consumer reporting agency shall notify the consumer of the reinsertion in writing not later than 5 business days after the reinsertion or, if authorized by the consumer for that purpose, by any other means available to the agency.

**(iii) Additional information**

As part of, or in addition to, the notice under clause (ii), a consumer reporting agency shall provide to a consumer in writing not later than 5 business days after the date of the reinsertion—

**(I)** a statement that the disputed information has been reinserted;

**(II)** the business name and address of any furnisher of information contacted and the telephone number of such furnisher, if reasonably available, or of any furnisher of information that contacted the consumer reporting agency, in connection with the reinsertion of such information; and

**(III)** a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the disputed information.

**(C) Procedures to prevent reappearance**

A consumer reporting agency shall maintain reasonable procedures designed to prevent the reappearance in a consumer's file, and in consumer reports on the consumer, of information that is deleted pursuant to this paragraph (other than information that is reinserted in accordance with subparagraph (B)(i)).

**(D) Automated reinvestigation system**

Any consumer reporting agency that compiles and maintains files on consumers on a nationwide basis shall implement an automated system through which furnishers of information to that consumer reporting agency may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other such consumer reporting agencies.

**(6) Notice of results of reinvestigation**

**(A) In general**

A consumer reporting agency shall provide written notice to a consumer of the results of a reinvestigation under this subsection not later than 5 business days after the completion of the reinvestigation, by mail or, if authorized by the consumer for that purpose, by other means available to the agency.

**(B) Contents**

As part of, or in addition to, the notice under subparagraph (A), a consumer reporting agency shall provide to a consumer in writing before the expiration of the 5-day period referred to in subparagraph (A)—

**(i)** a statement that the reinvestigation is completed;

**(ii)** a consumer report that is based upon the consumer's file as that file is revised as a result of the reinvestigation;

**(iii)** a notice that, if requested by the consumer, a description of the procedure used to determine the accuracy and completeness of the information shall be provided to the consumer by the agency, including the business name and address of any furnisher of information contacted in connection with such information and the telephone number of such furnisher, if reasonably available;

**(iv)** a notice that the consumer has the right to add a statement to the consumer's file disputing the accuracy or completeness of the information; and

**(v)** a notice that the consumer has the right to request under subsection (d) that the consumer reporting agency furnish notifications under that subsection.

**(7) Description of reinvestigation procedure**

A consumer reporting agency shall provide to a consumer a description referred to in paragraph (6)(B)(iii) by not later than 15 days after receiving a request from the consumer for that description.

**(8) Expedited dispute resolution**

If a dispute regarding an item of information in a consumer's file at a consumer reporting agency is resolved in accordance with paragraph (5)(A) by the deletion of the disputed information by not later than 3 business days after the date on which the agency receives notice of the dispute from the consumer in accordance with paragraph (1)(A), then the agency shall not be required to comply with paragraphs (2), (6), and (7) with respect to that dispute if the agency—

**(A)** provides prompt notice of the deletion to the consumer by telephone;

**(B)** includes in that notice, or in a written notice that accompanies a confirmation and consumer report provided in accordance with subparagraph (C), a statement of the consumer's right to request under subsection (d) that the agency furnish notifications under that subsection; and

**(C)** provides written confirmation of the deletion and a copy of a consumer report on the consumer that is based on the consumer's file after the deletion, not later than 5 business days after making the deletion.

**(b) Statement of dispute**

If the reinvestigation does not resolve the dispute, the consumer may file a brief statement setting forth the nature of the dispute. The consumer reporting agency may limit such statements to not more than one hundred words if it provides the consumer with assistance in writing a clear summary of the dispute.

**(c) Notification of consumer dispute in subsequent consumer reports**

Whenever a statement of a dispute is filed, unless there is reasonable grounds to believe that it is frivolous or irrelevant, the consumer reporting agency shall, in any subsequent consumer report containing the information in question, clearly note that it is disputed by the consumer and provide either the consumer's statement or a clear and accurate codification or summary thereof.

**(d) Notification of deletion of disputed information**

Following any deletion of information which is found to be inaccurate or whose accuracy can no longer be verified or any notation as to disputed information, the consumer reporting agency shall, at the request of the consumer, furnish notification that the item has been deleted or the statement, codification or summary pursuant to subsection (b) or (c) to any person specifically designated by the consumer who has within two years prior thereto received a consumer report for employment purposes, or within six months prior thereto received a consumer report for any other purpose, which contained the deleted or disputed information.

**(e) Treatment of complaints and report to Congress**

**(1) In general**

The Commission shall—

**(A)** compile all complaints that it receives that a file of a consumer that is maintained by a consumer reporting agency described in section 1681a(p) of this title contains incomplete or inaccurate information, with respect to which, the consumer appears to have disputed the completeness or accuracy with the consumer reporting agency or otherwise utilized the procedures provided by subsection (a); and

**(B)** transmit each such complaint to each consumer reporting agency involved.

**(2) Exclusion**

Complaints received or obtained by the Bureau pursuant to its investigative authority under the Consumer Financial Protection Act of 2010 shall not be subject to paragraph (1).

**(3) Agency responsibilities**

Each consumer reporting agency described in section 1681a(p) of this title that receives a complaint transmitted by the Bureau pursuant to paragraph (1) shall—

**(A)** review each such complaint to determine whether all legal obligations imposed on the consumer reporting agency under this subchapter (including any obligation imposed by an applicable court or administrative order) have been met with respect to the subject matter of the complaint;

**(B)** provide reports on a regular basis to the Bureau regarding the determinations of and actions taken by the consumer reporting agency, if any, in connection with its review of such complaints; and

**(C)** maintain, for a reasonable time period, records regarding the disposition of each such complaint that is sufficient to demonstrate compliance with this subsection.

**(4) Rulemaking authority**

The Commission may prescribe regulations, as appropriate to implement this subsection.

**(5) Annual report**

The Commission shall submit to the Committee on Banking, Housing, and Urban Affairs of the Senate and the Committee on Financial Services of the House of Representatives an annual report regarding information gathered by the Bureau under this subsection.

**(f) Reinvestigation requirement applicable to resellers**

**(1) Exemption from general reinvestigation requirement**

Except as provided in paragraph (2), a reseller shall be exempt from the requirements of this section.

**(2) Action required upon receiving notice of a dispute**

If a reseller receives a notice from a consumer of a dispute concerning the completeness or accuracy of any item of information contained in a consumer report on such consumer produced by the reseller, the reseller shall, within 5 business days of receiving the notice, and free of charge—

**(A)** determine whether the item of information is incomplete or inaccurate as a result of an act or omission of the reseller; and

**(B)** if—

**(i)** the reseller determines that the item of information is incomplete or inaccurate as a result of an act or omission of the reseller, not later than 20 days after receiving the notice, correct the information in the consumer report or delete it; or

**(ii)** if the reseller determines that the item of information is not incomplete or inaccurate as a result of an act or omission of the reseller, convey the notice of the dispute, together with all relevant information provided by the consumer, to each consumer reporting agency that provided the reseller with the information that is the subject of the dispute, using an address or a notification mechanism specified by the consumer reporting agency for such notices.

**(3) Responsibility of consumer reporting agency to notify consumer through reseller**

Upon the completion of a reinvestigation under this section of a dispute concerning the completeness or accuracy of any information in the file of a consumer by a consumer reporting agency that received notice of the dispute from a reseller under paragraph (2)—

**(A)** the notice by the consumer reporting agency under paragraph (6), (7), or (8) of subsection (a) shall be provided to the reseller in lieu of the consumer; and

**(B)** the reseller shall immediately reconvey such notice to the consumer, including any notice of a deletion by telephone in the manner required under paragraph (8)(A).

**(4) Reseller reinvestigations**

No provision of this subsection shall be construed as prohibiting a reseller from conducting a reinvestigation of a consumer dispute directly.

**(g) Dispute process for veteran's medical debt**

**(1) In general**

With respect to a veteran's medical debt, the veteran may submit a notice described in paragraph (2), proof of liability of the Department of Veterans Affairs for payment of that debt, or documentation that the Department of Veterans Affairs is in the process of making payment for authorized hospital care, medical services, or extended care services rendered to a consumer reporting agency or a reseller to dispute the inclusion of that debt on a consumer report of the veteran.

**(2) Notification to veteran**

The Department of Veterans Affairs shall submit to a veteran a notice that the Department of Veterans Affairs has assumed liability for part or all of a veteran's medical debt.

**(3) Deletion of information from file**

If a consumer reporting agency receives notice, proof of liability, or documentation under paragraph (1), the consumer reporting agency shall delete all information relating to the veteran's medical debt from the file of the veteran and notify the furnisher and the veteran of that deletion.

15 U.S.C § 1681n

§ 1681n. Civil liability for willful noncompliance

**(a) In general**

Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

**(1)(A)** any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000; or

**(B)** in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;

**(2)** such amount of punitive damages as the court may allow; and

**(3)** in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

**(b) Civil liability for knowing noncompliance**

Any person who obtains a consumer report from a consumer reporting agency under false pretenses or knowingly without a permissible purpose shall be liable to the consumer reporting agency for actual damages sustained by the consumer reporting agency or $1,000, whichever is greater.

**(c) Attorney's fees**

Upon a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

**(d) Clarification of willful noncompliance**

For the purposes of this section, any person who printed an expiration date on any receipt provided to a consumer cardholder at a point of sale or transaction between December 4, 2004, and June 3, 2008, but otherwise complied with the requirements of section 1681c(g) of this title for such receipt shall not be in willful noncompliance with section 1681c(g) of this title by reason of printing such expiration date on the receipt.

15 U.S.C.A. § 1681*o*

§ 1681*o*. Civil liability for negligent noncompliance

**(a) In general**

Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—

**(1)** any actual damages sustained by the consumer as a result of the failure; and

**(2)** in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

**(b) Attorney's fees**

On a finding by the court that an unsuccessful pleading, motion, or other paper filed in connection with an action under this section was filed in bad faith or for purposes of harassment, the court shall award to the prevailing party attorney's fees reasonable in relation to the work expended in responding to the pleading, motion, or other paper.

## CERTIFICATE OF SERVICE

I certify that on September 21, 2026, I filed the foregoing with the Clerk of the Court by using the ECF system. I also certify that the foregoing document is being served this day via transmission of Notices of Electronic Filing generated by ECF to all counsel of record.

*<u>/s/ Kevin P. Martin</u>*
Kevin P. Martin

## CERTIFICATE OF COMPLIANCE

This document complies with the word limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 12,386 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f), as counted by the word-processing system used to prepare the document.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in 14-point Times New Roman font, a proportionally spaced font, using Microsoft Word.

*/s/ Kevin P. Martin*
Kevin P. Martin